## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**WILHEMINA WILCOX,**

**Plaintiff,**

**-vs-**                                                    **Case No.  6:14-cv-1643-Orl-DAB**

**COMMISSIONER OF SOCIAL
SECURITY,**

**Defendant.**

_____

# Memorandum Opinion & Order

The Plaintiff brings this action pursuant to the Social Security Act (the Act), as amended, Title

42 United States Code Section 405(g), to obtain judicial review of a final decision of the

Commissioner of the Social Security Administration (the Commissioner) denying her claim for

Supplemental Security Income (SSI) benefits under the Act.

The record has been reviewed, including a transcript of the proceedings before the

Administrative Law Judge (ALJ), the exhibits filed and the administrative record, and the pleadings

and memoranda submitted by the parties in this case.  Oral argument has not been requested.

For the reasons that follow, the decision of the Commissioner is **REVERSED** and

**REMANDED.**

## I.      BACKGROUND

### A.      Procedural History

Plaintiff filed for SSI benefits[1] on September 10, 2012 alleging an onset of disability on June

24, 2010, due to mental limitations, including bipolar, depression, anxiety, schizophrenia; and

_____

[1]Plaintiff filed an application for Social Security Disability Insurance benefits, however, she did not have enough work credits to qualify for benefits, and that claim is not at issue in the appeal.  Doc. 20 at 2 n. 1 (citing R. 121-124).

physically, problems in both hands, including arthritis, trigger fingers, and carpal tunnel, as well as hypertension.  R. 245-53, 264, 276.  Her application was denied initially and upon reconsideration. R. 99-100.  Plaintiff requested a hearing, which was held on September 9, 2013, before Administrative Law Judge Ken B. Terry (hereinafter referred to as "ALJ").  R. 30-83.  In a decision dated November 15, 2013, the ALJ found Plaintiff not disabled as defined under the Act through the date of his decision.  R. 6-24.  Plaintiff timely filed a Request for Review of the ALJ's decision, which the Appeals Council denied on August 8, 2014.  R. 1-3.  Plaintiff filed this action for judicial review on October 9, 2014.  Doc. 1.

### B.     Medical History and Findings Summary

Plaintiff was born on November 5, 1964. R. 23.  She has a ninth grade education and past work as a janitor at Goodwill in 2011 and 2012.  R. 23, 79, 267, 277, 288.  Plaintiff worked there from May 2011 and stopped when her boyfriend had a stroke in October 2011 and died in January 2012.  R. 284. She returned to Goodwill in April 2012 and was let go in June 2012 due to her hands.  R. 43, 284, 288.  Plaintiff had previously been incarcerated at Gadsden Correctional Institution "on and off since 1999 to 2010" and at Lowell Correctional Institute "on and off from 1980 to 2010."  R. 283.  She was staying in a residential mental health shelter at the time of the hearing on September 9, 2013.  R. 39.

Plaintiff's medical history is set forth in detail in the ALJ's decision.  By way of summary, Plaintiff complained of mental impairments, hypertension, and hand problems.  R. 276.  After reviewing Plaintiff's medical records and Plaintiff's testimony, the ALJ found that Plaintiff suffered from a history of arthritis of the hands, carpal tunnel syndrome, asthma, obesity, possible borderline intellectual functioning, depression and a history of poly substance addiction, which were "severe" medically determinable impairments, but were not impairments severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. R. 11.  The ALJ determined that Plaintiff retained the residual functional capacity (RFC) to perform a significant range

of light work.  R. 13.  Based upon Plaintiff's RFC, the ALJ determined that she could not perform past relevant work.  R. 23.  Considering Plaintiff's vocational profile and RFC, the ALJ applied the Medical-Vocational Guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2, and, based on the testimony of the vocational expert ("VE"), the ALJ concluded that Plaintiff could perform work existing in significant numbers in the national economy as a production assembler, garment sorter, and cafeteria worker.  R. 23-24.  Accordingly, the ALJ determined that Plaintiff was not under a disability, as defined in the Act, at any time through the date of the decision.  R. 24.

Plaintiff first argues that the ALJ erred by not properly assessing her hand and social limitations.  Second, she contends that the ALJ erred by failing to properly assess the medical opinions in determining her RFC to perform sedentary work contrary to treating doctors' statements.  Third, Plaintiff contends the ALJ erred by finding that her mental impairment was not severe.  Fourth, she asserts that the ALJ erred by improperly applying the pain standard.  Fifth, she argues that the ALJ erred in evaluating her credibility.  All issues are addressed, although not in the order presented by Plaintiff.  For the reasons that follow, the decision of the Commissioner is **REVERSED** and **REMANDED**.

## II.    STANDARD OF REVIEW

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – *i.e.*, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th

Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

"If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004). "We may not decide facts anew, re-weigh the evidence, or substitute our judgment for that of the [Commissioner.]" *Id.* (internal quotation and citation omitted). *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520(b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520(c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520(d). Fourth, if a claimant's impairments do not prevent her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520(e). Fifth, if a claimant's impairments (considering her residual functional capacity, age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. 20 C.F.R. § 404.1520(f).

## III.    ISSUES AND ANALYSIS

### A.    RFC and the medical opinions

Plaintiff argues that the ALJ failed to apply the correct legal standards to the medical opinions of record, and in not properly assessing her hand limitations and social functioning limitations. Plaintiff contends that the ALJ failed to comply with the Eleventh Circuit's decision in *Winschel v. Commissioner of Social Security*, 631 F.3d 1176, 1178-1179 (11th Cir. 2011), requiring the ALJ to discuss the medical opinions. The Commissioner argues that substantial evidence supports the ALJ's finding regarding Plaintiff's residual functional capacity.

Residual functional capacity is an assessment based on all relevant evidence of a claimant's remaining ability to do work despite her impairments. 20 C.F.R. § 404.1545(a); *Lewis v. Callahan*, 125 F.3d 1436,1440 (11th Cir. 1997). The focus of this assessment is on the doctor's evaluation of the claimant's condition and the medical consequences thereof. *Id.* The following factors are relevant in determining the weight to be given to a physician's opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination"; (2) the "[n]ature and extent of [any] treatment relationship"; (3) "[s]upportability"; (4) "[c]onsistency" with other medical evidence in the record; and (5) "[s]pecialization." 20 C.F.R. §§ 404.1527(d)(2)-(5), 416.927(d)(2)-(5); *see also* 20 C.F.R. §§ 404.1527(f), 416.927(f).

The Regulations establish a "hierarchy" among medical opinions that provides a framework for determining the weight afforded each medical opinion: "[g]enerally, the opinions of examining physicians are given more weight than those of nonexamining physicians, treating physicians' opinions are given more weight than non-treating physicians. *McNamee v. Soc. Sec. Admin.*, 162 F. App'x 919, 923 (11th Cir. Jan. 31, 2006) (unpublished) (citing 20 C.F.R. § 404.1527(d)(1), (2), (5)). Thus, substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis*, 125 F.3d at 1440; *Edwards*, 937 F.2d at 583; 20 C.F.R. §§ 404.1527(d), 416.927(d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory

diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

"[T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. Unit B 1981) (citation omitted); see also 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).

The Eleventh Circuit, in *Winschel v. Commissioner of Social Security*, 631 F.3d 1176, 1178–79 (11th Cir. 2011), held that whenever a physician offers a statement reflecting judgments about the nature and severity of a claimant's impairments, including symptoms, diagnosis, and prognosis, what the claimant can still do despite his or her impairments, and the claimant's physical and mental restrictions, the statement is an opinion requiring the ALJ to state with particularity the weight given to it and the reasons therefor. *Id.* (citing 20 CRF §§ 404.1527(a)(2), 416.927(a)(2)*; Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1986)).

### 1. Hand limitations

Plaintiff argues in this case that the ALJ failed to properly consider her hand limitations which were treated by Dr. Gasner, her treating orthopaedic hand surgeon, and the consultative examiner, Dr. Perdomo. Plaintiff contends that Dr. Gasner's opinions show severe hand limitations, but the ALJ did not state the weight he gave Dr. Gasner's opinions. Plaintiff also argues that the ALJ erred in assessing the opinion of Dr. Perdomo when he failed to support his reasons for giving "no significant weight" to Dr. Perdomo's finding that Plaintiff can lift no more than 10 pounds with a right upper extremity in light of her acknowledged activity level." R. 22.

As is relevant here, the ALJ found Plaintiff suffered from a history of arthritis of the hands and carpal tunnel syndrome, which were "severe" medically determinable impairments.  R. 11.  In determining Plaintiff's RFC, the ALJ did not include any limitations regarding her hands, or particularly her right hand or wrist.  Instead, he found that she had "no limitations regarding manipulation."  R. 13.  Consequently, the ALJ did not include in the hypothetical question any limitation accounting for Plaintiff's hand limitations and instead, stated that she had the "ability to push-pull 20 pounds and occasionally and 10 pounds frequently" and "no significant limitations regarding manipulation."  R. 79-81.  The ALJ must employ hypothetical questions which are accurate and supportable on the record and which include all limitations or restrictions of the particular claimant.  *Pendley v. Heckler*, 767 F.2d 1561 (11th Cir. 1985).  Where the hypothetical employed with the vocational expert does not fully assume all of a claimant's limitations, the decision of the ALJ, based significantly on the expert testimony, is unsupported by substantial evidence.  *Id.*  at 1561 (quoting *Brenam v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980)).

In this case, Plaintiff had a history of pain in her hands and her right wrist from arthritis, carpal tunnel syndrome, and a "trigger finger" condition.  She explained that she injured her hand while incarcerated (R. 284) and had ongoing limitations from the pain, cramping in her hands, and would drop things.  R. 50, 66-67.  Plaintiff stated repeatedly in her applications to the SSA that she had pain and weakness in her hands, and she lost her janitorial job at Goodwill due to problems with her hands.  *See, e.g.,* R. 43, 285, 322.

In June 2012, Plaintiff received treatment at the Emergency Room for hand pain lasting two weeks; she was given wrist splints.  R. 430-35. Dr. Gasner examined Plaintiff on July 16, 2012 and noted trigger fingers in both hands, "pain with attempted use of the hands and locking up of her digits," and past treatment of injections heating pads, hot water, and adhesive pain patches.  R. 446. He documented locking of the fingers with pain, decreased tolerance to thumb extension/flexion, pain

in the right long finger, and he diagnosed her with bilateral multiple trigger digits; she received a steroid injection.  R. 446-47.  On July 18, 2012, an exam at Health Center for the Homeless found weakness in the right hand, inability to make a fist with the left hand, the middle finger staying flexed, difficulty extending a finger, and some finger locking in the right hand; she was diagnosed with bilateral carpal tunnel syndrome.  R. 565-66.

On July 25, 2012, Dr. Gasner found triggering in the thumbs, fullness with difficulty making a fist, and diagnosed "[b]ilateral hand pain consistent with flexor tenosynovitis and trigger digits, cannot exclude rheumatologic condition or inflammatory condition." R. 445.  On September 17, 2012, Dr. Gasner documented some relief from medication, triggering fingers "causing problems as well as occasional wrist discomfort," and Plaintiff's request for more aggressive treatment; he noted triggering of multiple fingers, Tinel's sign, and wearing Velcro splints, and diagnosed multiple trigger digits and possible early carpal tunnel syndrome.  R. 442-43, 446.  Later in the month, on September 28, 2012, Dr. Gasner noted triggering and pain in the fingers, diagnosed "bilateral hand multiple trigger digits," and performed a release procedure on her fingers.  R. 442.  Plaintiff's October 9, 2012 examination at the Health Center for the Homeless showed arthropathy.  R. 560.

At Dr. Perdomo's November 26, 2012 consultative examination, he noted Plaintiff's history of chronic hand pain with status post right carpal tunnel release and trigger finger release with now painful right hand movement.  R. 453.  Dr. Perdomo explicitly opined that Plaintiff should not lift more than ten pounds with the right hand and should "avoid repetitive use of the right hand including gripping maneuvers."  R. 453.

The Commissioner contends that Dr. Gasner's treatment of Plaintiff in September 2012 resulted in "good active flexion-extension of her fingers" (R. 442), and cites cases for the proposition that the ALJ did not need to include a (hand) limitation because Plaintiff had improved from the medication/treatment;  in fact, Dr. Gasner wrote a note for Plaintiff to return to work in July 2012.

Doc. 21 at 8 (citing R. 442, 447).  The Commissioner also points to Dr. Perdomo's notation of "normal fine manipulation in both hands" (R. 453) in support of the ALJ decision.

As an initial matter, the Commissioner cannot assert reasoning to support the ALJ's decision that the ALJ did not use as a basis for his decision.  "If an action is to be upheld, it must be upheld on the same bases articulated in the agency's order." *Baker v. Commissioner of Soc. Sec.*, 384 Fed. Appx. 893, 896 (11th Cir. June 23, 2010)[2] (citing FPC v. Texaco Inc., 417 U.S. 380, 397, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974)).  The Commissioner ignores the sequence of Plaintiff's treatment with Dr. Gasner – his note for Plaintiff to return to work on July 23, 2012 was written two months before Plaintiff returned to him on September 28, 2012 for more treatment complaining of the same triggering in her fingers.  R. 442, 445.  Moreover, when Dr. Perdomo examined Plaintiff two months later in November 2012, Plaintiff was still complaining of pain in her hands and wrist and Dr. Perdomo did include functional limitations based on his exam.  R. 452.  The Commissioner also mischaracterizes the importance of the phrase "normal fine manipulation" in that Dr. Perdomo noted the "normal" finding in the context of the *neurological* examination and yet still limited Plaintiff to "avoid *repetitive* use of the right hand including *gripping* maneuvers," even with her fine manipulation sensation intact.   R. 452 (emphasis added).  As Plaintiff points out, the ALJ also incorrectly noted that Plaintiff had not required carpal tunnel release surgery and had no other surgical treatment for her impairments (R. 21), even though Dr. Perdomo noted that she had had bilateral hand trigger finger surgical release (as the Commissioner concedes, *see* Doc. 21 at 8) and right carpal tunnel release (which the ALJ cited, *see* R. 19).  R. 452[3].  In discounting Dr. Perdomo's opinion, the ALJ gave "significant weight" to the opinion of the non-examining state agency reviewing physician who opined that Plaintiff was capable of the exertional limitations of light work in lifting of 20 pounds

---

[2]Unpublished opinions of the Eleventh Circuit constitute persuasive, and not binding, authority.  *See* 11th Cir. R. 36-2.

[3]Plaintiff acknowledged that these records could not be located in the Administrative Record.  Doc. 20 at 17 n. 7.

occasionally and 10 pounds frequently and unlimited push/pull without the hand or lifting restrictions that Dr. Perdomo suggested.  R. 21-22 (referring to R. 112)

Despite Dr. Gasner's significant records of Plaintiff's hand issues–which the ALJ did not specifically weigh or discount (R. 21-24)–and Dr. Perdomo's explicit opinion that Plaintiff should avoid "repetitive use of the right hand including gripping maneuvers," the ALJ omitted any hand limitation from the RFC.  In response to the ALJ's hypothetical which improperly included an unlimited push/pull ability and "no significant limitations regarding manipulation," the VE testified that Plaintiff could perform jobs including assembler, garment sorter, and cafeteria worker, jobs which would appear to require a good deal of handling, gripping and potentially repetitive movements[4]. Accordingly, the ALJ's opinion was not based on substantial evidence.

### B. Social functioning and mental limitations

Plaintiff also argues that the ALJ's determination that Plaintiff's difficulties in social functioning were "mild" and his failure to include any social limitations in her RFC is not supported by substantial evidence because the evidence show she suffered from a more severe limitation in social functioning.  Plaintiff also argues that the ALJ erred in not discussing the weight given to the opinion of Dr. Prickett, a psychologist who performed a consultative examination.

At the hearing on September 9, 2013, Plaintiff testified that she spent a lot of time in her room and isolating herself; she hears voices and has "crazy thoughts." R. 54-56. She also testified that she could not keep a job in part due to her attitude, she has had problems getting along with others her whole life and, while incarcerated for aggravated battery, she was in a fight and had to be put in solitary confinement.  R. 66-68.  Plaintiff's case manager also testified that she "most often pulls away" and isolates herself from others, had unstable moods, and had problems interacting with family

---

[4]The Court leaves this determination to the ALJ to determine through testimony from the VE upon remand.

and others. R. 74-76. She was written up three times at Goodwill and she has been fired in the past for getting angry. R. 51-52.

In the RFC assessment, although the ALJ did include a mental limitation restricting Plaintiff to simple, routine (not complex) tasks in unskilled work, he did not include *any* social functional limitations. R. 13-14. In the subsequent hypothetical question to the VE, the ALJ also did not include any social limitations. R. 79-81. The ALJ instead found:

> Mentally, the claimant does have a history of depression versus bipolar disorder with treatment and detoxification at Lakeside behavioral health (Exhibits l0F and 13F). Yet she has not required prolonged in-house hospitalizations for any of her alleged mental complaints and her mood swings were described as being stable with treatment (Exhibit 13F/2) as evidenced by the GAF of 70, which is indicative of no more than mild mental symptoms per the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (DSM-IV).
>
> This claimant has never worked much, has a long prison record, and has spent most of her adult life in prison for aggravated battery and other charges. She has a long history of alcohol and drug abuse and has recently completed an alcohol and drug rehabilitation program and it is noted that she has been clean for approximately one year (exhibits 5F and 9F). However, she has demonstrated the ability to control herself in the housing unit for the homeless shelter and through the drug treatment programs as evidenced by no confrontations and because she has demonstrated the ability to work on a part-time basis since she stopped doing drugs.
>
> Even though she had reported earlier suicide attempts (Exhibit 8F), there have been no documented suicide attempts and the recent medical treatment records or since her more recent work activity.
>
> The claimant has been prescribed and has taken appropriate medications for the alleged impairments, which weighs in the claimant's favor, but the medical records reveal that the medications have been relatively effective in controlling the claimant's symptoms.
>
> Although the claimant has alleged various side effects from the use of medications, the record indicates generally that those side effects are mild and would not interfere with the claimant's ability to perform work activities in any significant manner.
>
> The claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. She is able to live in a homeless shelter in a single room with roommates and other people and she does her own activities such as making her bed, washing her sheets, cooking, washing her own clothes and shopping one time per week. She also attends church on Sundays

and Tuesday nights and takes the bus to her doctor's visits without noted complications.

* * *

The State Agency psychologist opined that the claimant has the ability to understand and remember simple and detailed instructions. The claimant has the ability to maintain attention and concentration for periods of at least two hours duration. She may have occasional interruptions from psychologically based symptoms, hut has the ability to complete a normal workday and work week without an unreasonable number and length of rest periods. She would he able to complete simple tasks/work procedures and be able to make work decisions, hut would have difficulties with maintaining attention and concentration for extended periods and would have difficulties carrying out detailed instructions. She would have difficulties accepting criticism from supervisors and cooperating with others. The claimant has the ability to relate appropriately to peers and supervisors. She would he able to set realistic goals, but would have some difficulties reacting/adapting appropriately to work environment. The claimant has the ability to adapt to routine changes in the workplace (Exhibit 4A). The undersigned gives significant weight this opinion, as it is consistent with the treatment notes from Lakeside.

The undersigned accepts the consultative psychologist finding of bipolar disorder and polysubstance dependence, with a GAF of 54 to be consistent with moderate mental limitations such that it would not preclude simple, routine tasks on a consistent basis pursuant to the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) (Exhibit 8F). With that in mind, the undersigned gives that opinion some weight.

R. 21-22.

Plaintiff contends the ALJ should have considered her lengthy history of social functioning issues and diagnoses from the Health Center for the Homeless of schizoaffective disorder and borderline personality disorder (R. 600); from Dr. Prickett that she experienced "auditory hallucinations, visual illusions and difficulty with emotional control" (R. 415); and that she had stabbed someone to death with a switchblade (R. 415).

The Commissioner argues that Dr. Prickett's October 2010 opinion predates Plaintiff's "application date"[5] and it has "little relevance" to Plaintiff's disabling condition (Doc. 21 at 9), since Plaintiff had become compliant with her medications and her sobriety meant her condition had improved by 2012. The Commissioner also cites other evidence from the relevant period in support

---

[5]This argument fails to note that Plaintiff filed both an application for SSI and DIB alleging an onset date of disability of June 24, 2010 (R. 245-51, 264), which the DIB claim would have reached back to, except Plaintiff did not have enough quarters to qualify for DIB so she was denied on that basis.

of the ALJ's determination that Plaintiff did not have social limitations.  The Commissioner points to treatment records from Lakeside Behavioral Healthcare which show, the Commissioner argues, that despite her diagnosis of depression and bipolar disorder, Plaintiff generally presented with a congruent thought content/process, appropriate motor activity, cooperative behavior, good eye contact, and fair insight and judgment, that she reportedly felt "really good" and the combination of medication was working well.  R. 485, 489, 493, 500, 504, 508, 512, 615, 620.

The Commissioner also cites the consultative examination of the psychiatrist Dr. Austin in November 2012 in which he opined Plaintiff had average social functioning based on her reports to Dr. Austin that she had no auditory or visual hallucinations and was in a substance abuse treatment program.  R. 448-51.  The Commissioner additionally cites Plaintiff's testimony that she had friends at her rehabilitation facility with whom she socialized, that she "got along with everybody there," attended NA/AA meetings twice a week, religious services twice a week, and various life skills classes at the facility, and the case manager's testimony that Plaintiff was an active participant and played a "pretty active part in the community for the most part," although she sometimes isolated herself.  R. 62-65, 73-74.  As further evidence that Plaintiff was not limited in social functioning, the Commissioner points to the case manager's testimony that Plaintiff had never exhibited violent behavior while at the facility and had remained drug and alcohol free there, and, when asked if there was anything that made her think Plaintiff could not work with other people, the case manager responded in the negative. R. 72, 74-75.

Plaintiff's counsel aptly points out, the ALJ changed Plaintiff from "a formerly incarcerated murderer who fought in prison and who withdraws from people [into] a person with no social limitations at all.  The ALJ noted that she was able to control herself while in housing ([R.] 21). [However,] this does not negate the overwhelming evidence of social limitations. Showing [fewer] social limitations in a controlled environment focused on therapy does not indicate that these

limitations disappeared." Doc. 20 at 18-19. Plaintiff's ability to function in a very controlled, monitored environment of residential treatment in which she lived pretty much on-site for 24 hours per day (R. 76) and had very few household responsibilities, and received extensive therapeutic support, was not indicative of her ability to function in a real-world environment.

Plaintiff had a long history of incarceration in the State of Florida Department of Corrections where many of the charges were for battery or assault, including stabbing someone with a switchblade; she reported being hospitalized or incarcerated for approximately 29 years of her life. R. 372, 398, 413. Plaintiff was released from jail in March 2010, and examinations at that time by Lakeside Behavioral Healthcare psychologists noted having abnormal thoughts, wanting to hurt someone, feeling that people were watching her, being withdrawn; pressured speech and "high levels of anxiety and depression." R. 374-75. On July 8, 2010, Nurse Practitioner Edith D'aquila-Lloyd at the Health Center for the Homeless listed assessments of schizoaffective disorder, borderline personality disorder, and borderline intellectual functioning. R. 600.

On July 10, 2010, the consultative examining psychologist Dr. Prickett completed a Psychiatric Review Technique and opined that Plaintiff had limitations based on five categories of mental impairments: schizophrenic, paranoid and other psychotic disorders, anxiety-related disorders, met the Listing level for affective disorders-mood disorder and bipolar disorder (12.04), personality disorders-antisocial personality disorder (12.08), and substance addiction disorders (12.09). R. 399-407. Dr. Prickett opined that Plaintiff would have marked difficulties in maintaining social functioning and concentration, persistence, or pace. R. 409. He noted in the supporting discussion that "[s]he has significant difficulty getting along with others, including coworkers and supervisors. She has had numerous verbal and physical altercations with others." R. 411. He also noted that "substance abuse issues contribute considerably to her limitations. When she is taking medications

as prescribed, she is able to function reasonably well.  Functioning would likely improve with cessation of all alcohol/drug abuse and treatment compliance."  R. 411.

Three months later, on October 7, 2010, by Dr. Prickett evaluated Plaintiff to assess her ability to utilize vocational rehabilitation services.  R. 413.  Dr. Prickett diagnosed Plaintiff with Bipolar Disorder with psychotic features and borderline intellectual functioning, and polysubstance dependence, early full remission.  R. 415.  Dr. Prickett summarized Plaintiff's reports as follows:

> Wilhelmina Wilcox is a 45-year-old female who was referred to DVR by the Orange County Jail upon her release in 5/2010. She was hospitalized for three weeks beginning in June 2010 and continues to experience auditory hallucinations, visual illusions and difficulty with emotional control. Still, some improvement is seen with medication. Apparently, symptoms began at the age of 15 years and as a result of a visual hallucination and delusional thinking, she stabbed another individual to death with a switchblade. She was incarcerated and charged as an adult. She also has a history of substance abuse but has been clean and sober for 90 days. She reports multiple medical problems for which she is being treated.

R. 415.  Dr. Prickett noted Plaintiff's active reports of hallucinations, and "difficulty with anger control":

> She currently reports auditory hallucinations, seeing shadows and difficulty with anger control. She has also had suicidal ideation. Without medication she will frequently rock while sitting, is fidgety, anxious, depressed, abuses alcohol, gets involved in fights and will go several days without sleep. . . .

> She showed some agitation as she tended to rock back and forth during parts of the interview. She tended to speak quickly and was somewhat circumstantial. Still, she was rational, coherent and goal directed. She appeared moderately anxious and at least moderately depressed. She denied current suicidal thoughts. She reports that she still sometimes sees shadows and has infrequent auditory hallucinations. She states that medication has been helpful in reducing the severity of her symptoms. She was oriented times three. Concentration appeared mildly to moderately impaired and memory was mildly impaired for recent and remote events. She reported that her appetite was good and sleep is now good with medication. She experiences infrequent headaches. Insight is mildly impaired and judgment questionable.

> During the intellectual assessment, she tended to give up quickly at times and demonstrated a degree of impulsivity in her approach to the various tasks. Also, she had some difficulty following detailed instructions and has limited ability to self-structure and think through problems in a methodical, organized fashion. . . .

**Intelligence**: On the WAIS-Ill, Wilhelmina obtained a Verbal IQ of 70, a Performance IQ of 78 and a Full-Scale IQ of 72, placing her within the borderline range of adult intellectual functioning. The 8-point discrepancy between the Verbal and Performance scales is not significant at the .05 level.

R. 414.

Dr. Prickett also found that, in terms of her personality, Plaintiff had "a chronic marginal schizoid adjustment" which likely caused depression and anxiety:

**Personality:** On the MMPl-2, Wilhelmina's profile is valid but consistent with those who tend to deny common human faults. She acknowledged unusual experiences somewhat more than the typical individual but may have greatly exaggerated problems to create the impression of a severe emotional disturbance.

The clinical scales are consistent with individuals characterized by a chronic marginal schizoid adjustment. These individuals have difficulty with close relationships, tend to distrust others and are socially withdrawn. They tend to see the world as dangerous and others as rejecting and unreliable. Similar individuals are likely to experience significant symptoms of depression and anxiety. Behavior may be unpredictable and they may have a history of social or legal difficulties as a result of impaired judgment and problems thinking logically. These individuals may be overactive, emotionally labile and have outbursts of temper. Manic features are likely. Lastly, physical symptoms may increase during times of stress. Similar individuals are likely to have limited insight. . . .

The personality inventory is valid but consistent with individuals who may have greatly exaggerated problems to create the impression of a severe emotional disturbance, possibly due to severe ongoing personal distress. Socially, these individuals are likely to make a marginal adjustment, have difficulty with relationships, distrust others and see others as dangerous. Fluctuations in mood, ranging from mania to depression, and difficulty with thinking are suggested. *These individuals may have limited emotional control and limited insight.*

In terms of recommendations, Wilhelmina should be strongly encouraged to maintain her involvement in the residential treatment program and in psychiatric care. She is doing reasonably well but continuing intervention is clearly needed. Also, it is obviously essential that she remain clean and sober. While she may have difficulty completing the GED, she has worked in the past and appears capable of relatively simple, routine work tasks. *She would likely require an understanding supervisor* and some degree of assistance in developing good work habits. The need for ongoing psychiatric intervention is essential to address issues as they arise. . . . *Also, her interpersonal style and psychiatric symptoms may, at this time, interfere with a successful work adjustment in a setting that requires significant interaction with the general public.*

R. 415-16 (emphasis added).  The ALJ did not even discuss what weight he gave Dr. Prickett's opinion, despite the fact that it was generated with months of the Plaintiff's alleged onset date of June 2010 (although she was only eligible for SSI).

Plaintiff apparently did not receive regular mental health treatment from late 2010 through 2011, until her boyfriend died and she was admitted on a voluntary basis to Lakeside in December 2011.  Plaintiff subsequently  returned to the Anchor residential treatment center by 2012.  R. 485, 497.

On November 19, 2012, William Austin, Psy.D., and Kelley Sanders, Ph.D., performed a consultative examination of Plaintiff, diagnosing her with moderate bipolar disorder with a manic episode and problems with social environment, primary support group, occupational difficulties, and problems with the legal system. R. 451.  Plaintiff reported to Dr. Austin a history of three suicide attempts and a psychiatric hospitalization one year before.  R. 449.  Dr. Austin opined Plaintiff's "social functioning is average based on limited social relationships" and her functional ability was "moderately impaired based on mood swings, agitation, and irritability."  R. 450.

In contrast to Dr. Prickett's opinion that Plaintiff "would require an understanding supervisor" and "her interpersonal style and psychiatric symptoms" would interfere with interactions with the general public and Dr. Austin's finding that Plaintiff was "moderately impaired based on mood swings, agitation, and irritability," the ALJ found that Plaintiff had "mild difficulties" in social functioning. R. 12.  He determined that she had mild difficulties because she had friends at the drug and rehabilitation program facility (Anchor), attended NA/AA meetings, church services, Life Skills and Budgeting classes, and Bible study on the premises for an hour or two each week. R. 12.  The ALJ inconsistently also determined that  Plaintiff "would have difficulties accepting criticism from supervisors and cooperating with others and "would have some difficulties reacting/adapting appropriately to work environment." R. 22.  The ALJ found, based on Plaintiff's activities at the

highly-structured drug/alcohol rehabilitation center, that she had the ability to adapt to routine changes in the workplace.  That finding is not based on substantial evidence.  Moreover, although the ALJ stated that"gave significant weight" to the February 25, 2013 opinion of the state agency reviewing psychologist, Dr. Butler (R. 22), the ALJ blatantly ignored some of the psychologist's social functioning opinions, *i.e.*, that Plaintiff was moderately limited in the ability to interact appropriately with the general public, the ability to accept instructions and respond appropriately to criticism from supervisors, and she would have difficulties accepting criticism from supervisors and cooperating with others.  R. 116.   The ALJ failed to include any of these limitations in the RFC or the hypothetical to the VE.  Accordingly, the ALJ's decision was not based on substantial evidence.

## IV.   CONCLUSION

For the reasons set forth above, the ALJ's decision is consistent with the requirements of law and is supported by substantial evidence.  Accordingly, the Court **REVERSES** and **REMANDS** the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g).  The Clerk of the Court is directed to enter judgment consistent with this opinion and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on March 15, 2016.

*David A. Baker*

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record